Filed 2/11/15  P. v. Baskin CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>DEJON ANDREW BASKIN,<br><br>   Defendant and Appellant. | F066129<br><br>(Super. Ct. No. F09904123)<br><br><br>**OPINION** |

APPEAL from judgment of the Superior Court of Fresno County.  Edward Sarkisian, Jr., Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Dejon Andrew Baskin of three counts of willful, deliberate and premeditated attempted murder (Pen. Code, §§ 664/187, subd. (a)).[1] As to each count, the jury found true the allegation that Baskin personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). As to counts one and two, the jury found true the allegations that Baskin personally and intentionally discharged a firearm, proximately causing great bodily injury (§ 12022.53, subd. (d)). As to counts one and three, the jury found true the allegations that Baskin personally used a deadly weapon, a knife (§ 12022, subd. (b)(1)).

The trial court sentenced Baskin to three consecutive terms of life in prison on the attempted murder; two consecutive terms of 25 years to life on the great bodily injury firearm enhancements; a consecutive five-year term on one domestic violence enhancement; and a one-year consecutive term on the personal use of a knife enhancement. The trial court stayed the terms on the remaining enhancements pursuant to section 654.

On appeal, Baskin contends that the trial court erred when it failed to inform the jury of stricken opinion testimony, when it failed to instruct on the limited admissibility of uncharged bad acts, and when it failed to instruct on a lesser offense of attempted murder. Baskin also contends the prosecutor committed misconduct requiring reversal, that there is no substantial evidence of great bodily injury as to one of the enhancement allegations, and that cumulative error occurred. We disagree and affirm.

**STATEMENT OF THE FACTS**

*Background*

Baskin and Rachel met in July of 2004. At the time, she was 19 and living in Selma and he was a Marine in North Carolina. At the suggestion of Rachel's good friend

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

Liz, whose boyfriend James Moreno was in the Marines with Baskin, Rachel contacted Baskin and the two began communicating over the telephone. Rachel, a student at Fresno City College, lived with her mother, Linda, and her brother, Christopher[2], who worked as a correctional officer (collectively victims).[3] According to Baskin, he was a martial arts instructor at Camp Lejeune and had just returned from a tour overseas. Prior to that, he had been stationed in Japan.

Rachel met Baskin several times in person before he was supposed to visit her in Selma for the entire week before Christmas 2004. Baskin did not show up as scheduled and did not answer repeated telephone calls. He finally contacted Rachel on Christmas Eve and claimed he had been at the airport in Fresno for a week, but had broken his phone and did not know Rachel's number and been unable to call her. When Rachel later confronted Baskin with a ticket showing he had not flown into Fresno until December 24, Baskin claimed he could not tell Rachel where he was because he had been on a secret mission. When Rachel then learned that Baskin was absent without leave, he asked Rachel to lie about his whereabouts.

After Baskin was deployed to Iraq in 2005, he and Rachel continued to communicate via e-mail. Moreno, who was deployed with Baskin to Iraq, was not aware that Baskin was ever involved in combat or fighting of any sort during that deployment.

When Baskin returned from Iraq, he reenlisted in San Diego so that he and Rachel could get married. During the month before he reenlisted, Baskin and Rachel stayed with her friend Corrina. At some point during the stay, Baskin suggested to Rachel that he had engaged in a sexual relationship with Corrina. Rachel also found considerable

---

[2]    Christopher's given name is Frank Christopher, but has always gone by Christopher.

[3]    We refer to the victims by their first names for clarity and mean no disrespect.

pornographic material on Baskin's computer. Although Rachel thought of ending their relationship, Baskin proposed marriage and she accepted.

Baskin and Rachel married in October of 2005 without telling anyone, and Baskin returned alone to Marine Corps Air Station Miramar in San Diego. Marine Corporal Tyrelle Greene met Baskin at Miramar because the two were working as heavy equipment operators and lived next to each other in the barracks. The two spent a lot of time together and drank heavily. Baskin never mentioned to Greene about having any trauma, bad dreams, night sweats or night terrors as a result of his deployments. Baskin bragged to the others that he was somehow able to collect a basic housing allowance to pay for off-base housing because he was married, but also live in the barracks for free.

Rachel's mother, Linda, eventually learned Rachel and Baskin were married and was not happy about it. For the next six months, Baskin would not commit to having Rachel move down to San Diego to be with him and the two argued often about it. By this time, Rachel was living with her mother and Christopher, who had moved to Reedley. Baskin eventually told Rachel he did not want her to move to San Diego because he was going to be sent on another deployment in September of 2006. Sometime in July or August of 2006, Baskin was arrested for driving under the influence on the base and was ordered to undergo a 30-day rehabilitation program in October of 2006. Rachel was aware of Baskin's drinking problem.

Baskin did not ask Rachel to attend the Marine Corps Ball, held in November of 2006, as he had the year before. Instead, Baskin said he was going with his friend Greene and his wife. Years later, Rachel learned that Baskin attended with a fellow Marine and stayed with her in a hotel that night. When Baskin next visited Rachel, he showered her with gifts.

Baskin continued to drink heavily, including on New Year's Eve in 2006 when he was "falling down drunk" and tried to start fights with Rachel's friends' husbands. At the

4

beginning of March 2007, Baskin became extremely drunk and belligerent at Rachel's sister's birthday party. He tried to start a fight with Rachel's brother-in-law. In the middle of the night, Rachel woke to find Baskin urinating on her desk. When Rachel confronted him about it, he claimed he did not do it and lunged at her. Linda noticed that Baskin drank "all of the time" and became more aggressive the more he drank.

In the middle of March 2007, Baskin was deployed to Iraq, as was Greene. That same day, Rachel discovered she was pregnant. Baskin and Greene lived on a tight security base in Iraq and worked together as heavy equipment operators, driving forklifts and using cranes. Neither of them ever left the base nor interacted with any Iraqi forces or other enemies while in Iraq. No one from their unit was killed, although it was not uncommon to hear bombs going off in the distance while on base.

In September of 2007, about two weeks before Baskin was set to return to San Diego, Rachel learned that he had been communicating with other women on the Internet and had made plans to see some of them when he returned to the United States. Rachel informed Baskin that she was going to leave him, but he claimed it was just a game with his fellow Marines to see who could get the most women to respond to them. Rachel did not want her child to come from a broken home and agreed to stay with Baskin, who promised to move Rachel to San Diego and to attend marriage counseling.

Rachel gave birth to Leilah in November of 2007. In January of 2008, Rachel and Leilah moved in with Baskin, right next door to Greene and his wife. Baskin soon became angry with Rachel about a variety of things. He continued to drink heavily. He told her that if she ever tried to leave him, he would "just kill [her] anyway." Sometimes Baskin would make Rachel play a video game with him in which he would gun down her character repeatedly and then say, "Okay, I'm not mad at you anymore."

Despite Baskin leaving day or night for hours without telling Rachel where he was, he required her to report to him exactly where she would be going and for how long.

5

Although Baskin insisted he was not using drugs, Rachel did not believe him as they were readily available at various parties and she once saw him get pills from a friend.

Greene's friendship with Baskin began to deteriorate as Greene realized that Baskin told him many lies. James Moreno, who also served with Baskin in the Marines, also thought Baskin was untruthful and often lied.

In August of 2008, Baskin did not renew the lease on their apartment and told Rachel to move back to Reedley with her family. In January of 2009, Baskin told Rachel he had met a girl named Nikkie Purdy. In February of 2009, Baskin insisted on letting Leilah stay with him alone without Rachel around so that Rachel would understand how hard it was for Baskin to be away from Leilah for long periods of time. Rachel initially resisted, but then gave in and allowed Leilah to stay in a hotel with Baskin. When Rachel picked up Leilah a week later, Leilah had been in Baskin's barracks room the entire time, she was dirty, had severe diaper rash and bruises on her head. At that point, Rachel decided that she was going to leave Baskin.

During her entire relationship with Baskin, Rachel never once heard him talk about committing suicide. Although he told her he suffered from posttraumatic stress disorder (PTSD), he later said he only claimed to have suffered from PTSD to get disability benefits from the military. Rachel never saw Baskin experience night sweats or horrific nightmares, nor did she ever find him pacing the apartment. And she did not see him disoriented or respond inappropriately or dramatically to loud noises except when he was intoxicated.

Rachel filed for divorce on February 17, 2009. Baskin then began to threaten Rachel that he would do whatever it took to take Leilah away from her. Rachel was eventually given sole physical and legal custody of Leilah and Baskin was ordered to pay child and spousal support. Baskin was given weekly supervised visits.

6

Baskin was very angry about having to pay Rachel and said there was "no way in hell" he would do so. He was also extremely upset about having to have supervised visits with Leilah. Between April and July of 2009, Baskin did not give Rachel any money and he did not visit Leilah. When Rachel told Baskin his wages might be garnished, he continued to threaten Rachel. When she asked if she needed to get a restraining order against him, he laughed and said, "Do whatever you want. If I wanted to I would kill you and your whole family."

On July 15, 2009, Rachel had an argument over the telephone with Baskin in which she told him she was going to let the Department of Social Services enforce the child support order since he would not pay her. Baskin then called back and left a message promising to pay her and that he was sorry for arguing. When Rachel returned Baskin's call after work, he sounded fine, even asking for a green bean recipe.

*July 16, 2009*

When Rachel woke up shortly before 7:00 a.m. on July 16, 2009, she went out to the garage to get a shirt. She noticed that the usually locked door to the garage was open. When she entered the garage, she noticed someone walking toward her from outside. Before she knew it, the person placed a gun to her head and Baskin, in a disguised voice, said, "Shut the fuck up. I swear I'm going to kill you. I'm going to fucking kill you. Shut the fuck up." Baskin was wearing a mask with only his eyes and eyebrows visible. He had a dark hoodie over his head and was wearing black boots, jeans, and green camouflage gloves. He had a gun in his right hand and a knife in his left. He did not appear to be under the influence of alcohol or drugs. Rachel asked Baskin what he was doing as he held her by the arms and struggled with her.

Rachel managed to reach the door to the house, pull it open and yell to Linda, who was inside, to get help. Baskin grabbed Rachel by the hair and swung her into the house

onto the floor. He then cut Rachel's hands with the knife and her thumb was gushing blood.

Baskin, who now had his mask pulled down, pointed the gun at Christopher, who had come into the room. Baskin had Rachel, Linda and Christopher sit down on the living room couch and kept the gun pointed at them. Baskin told Rachel that Social Services had been calling him. Baskin was worried that Christopher and Linda had already called the police and he kept looking out the front blinds.

In an effort to retrieve her cell phone, which was in the bathroom, Rachel told Baskin she needed to go to the hospital for stitches on her bleeding thumb, or at least to the bathroom for peroxide. But instead, Baskin told the victims not to "try anything" and went to the bathroom himself to get the peroxide. When the victims repeatedly told Baskin to leave, he said he had already committed burglary, so he would be going to jail no matter what happened.

Baskin then started to say that he was going to kill himself. Each of the victims offered to let Baskin kill them if he would let the other two go. This made Baskin angrier.

Baskin then directed the victims at gun point to Leilah's room so he could see her. After talking to Leilah for a while, Baskin directed the victims back to the living room.

There, Baskin again said he would kill himself, this time saying he was going to do so so that Rachel would get $400,000 in life insurance. Baskin insisted that Christopher write out a will for him. Christopher believed this was a stall tactic on Baskin's part and he never noticed anything about his behavior that Baskin actually intended to kill himself.

Baskin then loaded the magazine of his gun with a .22 bullet, saying he had done so because "it does more damage because it bounces around." Baskin said he had only one bullet and he had taken the time to engrave his initials into it. Baskin then cocked the

gun, grabbed a pillow from the couch, and tried to jam the gun into the pillow. He struggled with it for a bit and Rachel then heard a gunshot and ducked. She heard ringing in her left ear and the side of her head was "on fire." When she grabbed her ear, she noticed blood. Rachel looked at Baskin and yelled, "You fucking shot me." Baskin responded that he "barely grazed" her.

Baskin then walked over to Christopher, placed the barrel of the gun to Christopher's head and fired directly above his left eye. Christopher's head jerked back, some fleshy material popped out, and blood started to drip out of his head. He lost consciousness and slumped over.

Baskin then lunged at Linda with the knife, aiming for her heart. When she moved her arm, he cut her right wrist. Linda tried to get away, but Baskin threw her on the ground and stomped on her and kicked her so hard she flew into things and knocked over items. He then grabbed her by the hair, pulled her neck up and started "sawing" her neck with the knife. Baskin then left Linda on the floor.

While this was going on, Rachel ran to the bathroom to retrieve a cell phone. She then heard Baskin demand that she return or he would kill Leilah. Baskin went into the bathroom and yanked Rachel out and took her back to the living room. He pulled her hair to the side and slashed her throat with the knife. Rachel pretended to die and fell to the ground. Baskin went back to Linda, who was starting to get up.

Rachel's neck was gushing blood. She curled up between a love seat and a high chair and tried to call 911. She was dripping so much blood that she had to keep wiping it off her phone. When she finally got through to 911, she was scared to say anything, but then yelled the address into the phone.

When Baskin heard Rachel do this, he stopped attacking Linda and got on top of Rachel, knocked the phone from her hand, and started sawing at her neck again. Rachel felt air come out of her throat and she could taste blood in her mouth.

9

Rachel grabbed the blade of the knife, suffering a wound to the bone of her hand, and was finally able to get away from Baskin. After Rachel got up, she saw Baskin again cutting Linda's throat. Rachel was worried that her 911 call had not gone through. She ran to the back of the house, grabbed Christopher's cell phone and started to dial 911 when she looked down the hall and saw Christopher get up and jump on top of Baskin. Christopher choked Baskin until he let go of the knife.

Linda then got up, opened the front door and went across the street to a neighbor's. Rachel realized she needed to get out of the house as well, dropped the phone, ran to her room and grabbed Leilah and ran outside yelling for help. Rachel stood in the middle of the road until a car stopped and picked up Rachel and Leilah and took them to a nearby gas station while calling 911. She saw multiple police cars heading toward the house.

*Police and Emergency Personnel Response*

Reedley Police Officer Ray Camacho arrived on the scene at 8:17 a.m. As he drew his gun and walked down the street, he saw Baskin with a cigarette in his hand. When the officer pointed his gun at him, Baskin put his hands in the air and followed the officer's command to get down on the ground. When the officer asked where Baskin left the gun, he said it was in the house. Baskin then said, "I was trying to kill myself, but they tried to stop me. There's a will inside."

Paramedic Amana Wilkinson arrived shortly thereafter and made contact with Rachel, who was still in the truck holding Leilah and bleeding profusely from wounds in her neck. Rachel was able to speak using short words. The paramedic heard audible air coming from Rachel's neck wounds and believed her trachea had been severed. The paramedic thought both Rachel's inability to get oxygen and her blood loss were life threatening injuries. She was put on high flow oxygen and a cardiac monitor and subsequently airlifted to the hospital.

10

At 8:30 a.m., emergency room physician Gene Kallsen, M.D., learned two throat-slash victims and one gunshot victim were being brought to the hospital. Rachel and Linda were immediately taken into surgery because slashed throat victims present numerous life-threatening concerns: bleeding to death within minutes; collapsed lungs causing suffocation; and severance of the spinal cord, which would likely result in nearly instant death.

Because Rachel's throat was slashed, blood had entered her windpipe, and she had also suffered a partial laceration of her trachea. Dr. Kallsen opined that Rachel's injuries were life threatening and she would have died had she not received medical treatment. Rachel underwent surgery to repair her trachea, blood vessels and skin, as well as injuries to her hands. She spent six days in the hospital.

After the operations, Rachel was left with multiple scars on her neck. She is unable to straighten her ring finger and pinky finger on her right hand. She also received stitches above her left ear from the gunshot wound, resulting in a scar that, three years after the accident, sometimes still hurt.

Dr. Kallsen noted that Linda suffered nearly the same neck injuries as Rachel, causing her to blow bubbles of air and blood out of her neck each time she breathed. Similar surgeries were performed on Linda and Dr. Kallsen opined that she would have died from her injuries had she not received medical attention. Linda also suffered approximately 12 stab wounds to her abdomen and stomach. After undergoing surgery, she spent four or five days in the hospital. Linda still had dislocated vertebrae as a result of Baskin repeatedly kicking her. She can no longer use the two middle fingers of her right hand because the nerves were cut.

According to Dr. Kallsen, Christopher suffered a gunshot wound to the head, with the entrance in the forehead. The bullet fractured his maxillary bone. The injury was

11

determined to be inoperable and caused complete blindness in one eye. Christopher lost his job as a correctional officer as a result of the injury, which still caused headaches.

*Baskin's Arrest and Subsequent Investigation*

When Reedley Police Officer Brian Pelayo arrived on the scene, he placed Baskin in handcuffs. When the officer alerted the other officers on the scene that Baskin had blood on his hands, Baskin said, "It's theirs, not mine."

The vehicle Baskin had driven, a Toyota Scion, was located one-half mile from the home where the victims lived. Inside the vehicle, officers found an empty Ruger gun box, with an instruction manual for a Ruger Mark III (an auto loading pistol). There was an empty magazine in the box. There was a July 15, 2009, receipt in the car from Big Lots, listing cutlery as one of the items purchased.

In a search of the victims' home, officers found a knife inside the front door. A black Ruger .22-caliber handgun, containing one live bullet in the chamber, was found between the arm and cushion of the couch. Two spent casing were found nearby.

Baskin was taken into custody and advised of his *Miranda*[4] rights. In a recorded interview conducted by Detective Diedrich and Sergeant Aleman, Baskin told the officers that he was supposed to die, "not them," and that he had wanted to see his daughter one more time. Baskin described the knife he had as a regular kitchen knife he wanted to use to slit his wrist. According to Baskin, he accidentally cut Rachel's thumb when she grabbed the gun. After getting a wrap and peroxide for Rachel's thumb, Baskin claimed he spoke to the victims and apologized for "fuckin up their lives." He then went to see his daughter in the bedroom one last time, gun still in hand.

Baskin told the officers he had Christopher write out a will for him, that the victims all tried to talk him out of killing himself, and the gun then went off "the wrong

---

**4**      *Miranda v. Arizona* (1966) 384 U.S. 436.

way." After the bullet went off by Rachel's ear, Baskin grabbed her head and Christopher lunged at him and the gun went off again.

When asked how Linda was injured, Baskin said "they lunged at me," he "panicked and I uh murdered my family. It wasn't supposed to be them." Baskin told the officers he had "the worst like night terrors" and that he was "like a fuckin schizophrenic fuckin sociopath."

A Department of Justice criminalist testified that the "thumb safety" on the left side of the gun was easily activated. The criminalist opined that, with the amount of trigger pull the gun had, it would be impossible for the gun to be accidentally discharged.

In a subsequent search of Baskin's apartment in San Diego, Detective Ryan Deuel noticed that a large kitchen knife was missing from the knife set. Baskin's girlfriend Purdy did not know where the knife was.

*Baskin's Relationship with Purdy*

Purdy met Baskin in January of 2009 and began a sexual relationship with him in February of 2009. Baskin claimed to be divorced. According to Purdy, Baskin drank hard liquor every other day and had a lot of anger issues when he did. Purdy slept with Baskin four or more nights a week, but never saw him wake up with nightmares or night sweats. He never told Purdy he was experiencing flashbacks, nor did he state he wanted to hurt himself in any way. Baskin never told Purdy he had been hospitalized for schizophrenia, and he never talked about seeing persons in Iraq getting their heads blown off or seeing any atrocities of war.

The evening before the attacks on the victims, Baskin and Purdy bought groceries and some cooking utensils at Big Lots and then cooked dinner for some friends. Baskin drank the same amount of alcohol he usually drank; he did not seem sad or upset and did not talk about committing suicide. Purdy went to sleep early because she had a headache. At some point, Baskin came into the bedroom and asked if he could use her car so he

13

could give the guests a ride home.  When Purdy woke the next morning, Baskin and her vehicle were not there and calls to his telephone went unanswered.

*Baskin's Telephone Calls from Jail*

In a telephone call made from jail on July 28, 2009, Baskin told his mother he met with a lawyer and the lawyer "thinks we can win."  When Baskin's mother told him she had spoken to Purdy and thanked her for standing by him, Baskin directed his mother to call Purdy immediately and tell her he loved her and would like her to visit.

Baskin told his mother that his attorney had to prove "that I wasn't in my right state of mind, which I wasn't .…"  When his mother noted that a judge would recommend he be hospitalized, Baskin said he knew and he would be released into Purdy's custody.   According to Baskin, he would have to tell the doctor about "my PTSD, my … chronic depression.  I gotta tell him about fuckin' uh my schizophrenia and like why I feel … like all that stuff.  I gotta talk about all that stuff.  He and I gonna have a nice little conversation I just hope I don't start crying like a little punk."

Nearly two years later, on May 13, 2011, Baskin telephoned his mother from jail and told her he met with a psychiatrist and she had diagnosed him with chronic PTSD.  According to Baskin, his lawyer told him he had a strong case and that the district attorney was probably going to try to get him a deal, which he did not want.  He noted that, if the prosecutor's case for attempted murder was not strong, they would send him home with no charges "and I'm suing, period."

In a May 15, 2011, telephone call from jail, Baskin asked his mother to quickly send him tax records so he could get a warrant out for Rachel's arrest.  Baskin thought that, if Rachel was in jail due to a "federal indictment" when he was released and he had a house and insurance, he would be able to get full custody of Leilah.  According to Baskin, once released, he would not need a job but would get $2,800 a month to go to

14

school, $1,020 a month SSDI, and another $1,020 a month for Leilah. Baskin explained, "[I]t's called an earmark. Yes, that's how it works .…"

*Defense Evidence*

Sociology professor William Brown opined that Baskin was "a product of the military total institution slash military culture," which he described as the military's way of training a recruit to entirely change his or her way of thinking and acting in order to comply with military standards. Marines were taught obedience, discipline, survival and sacrifice, and they were to fight and not flee. According to Dr. Brown, Marines and other armed services personnel retained the military mindset after leaving the military.

Baskin had a military life insurance policy for $400,000, and the principal beneficiary was Rachel. According to Dr. Brown, the policy was still valid in the event of suicide if the individual was in the Marine Corps.

After Baskin's arrest, Psychiatrist Robert Thomas Ensom treated Baskin at an inpatient psychiatric health facility (PHF) after he was placed on a Welfare and Institutions Code section 5150 72-hour hold (5150 hold) and a subsequent 14-day hold (5250 hold) based on Baskin's stated desire to kill himself. Baskin told Dr. Ensom that he had been diagnosed with schizophrenia when he was younger, and that he had a problem with alcohol and continuing auditory hallucinations off and on throughout his life. Baskin mentioned losing his father the previous year after he was shot by police and suffering long-term depression following his death. Baskin also described being exposed to killing and serious injury while in the military, and he described "flashback memories when everything just goes black." Dr. Ensom acknowledged that Baskin's description of a flashback memory as something going "black" was not an accurate flashback description and could mean he was malingering.

Regarding the attack, Baskin told Dr. Ensom he planned to drive to Fresno to see his daughter and commit suicide by shooting himself in the head, but the gun, which

15

contained only three rounds, misfired. According to Baskin, he was then attacked by a male in the room, but had only fragments of memories of what happened next. Baskin told Dr. Ensom he did not want to live and he would wake up in a dream-related belief that he had blood on his hands.

On July 22, 2009, Dr. Ensom diagnosed Baskin with PTSD along Axis I, with alcohol abuse. PTSD is an anxiety disorder initially caused by severe emotional trauma or threat involving a risk of death or injury, re-experienced in the form of nightmares. Insomnia, impaired mood control with crime or anger, impaired concentration, and hyper vigilance result. Dr. Ensom prescribed medication to help alleviate Baskin's symptoms of hearing voices. Dr. Ensom examined Baskin again in mid-October 2010 after Baskin attempted suicide at the jail by putting a sheet around his neck.

On cross-examination, Dr. Ensom acknowledged that Baskin made a point to emphasize that he had experienced a great deal of trauma in Iraq, as well as other traumas, without giving the doctor specific details about the traumatic events. An individual emphasizing the traumas was not the norm, according to Dr. Ensom, who had treated many PTSD patients. In fact, it was the only time Dr. Ensom had seen a patient behave in that way. Dr. Ensom based his diagnosis only on what Baskin told him and not on any other verifiable information.

Psychiatrist Luuyen Luu described the diagnostic criteria of PTSD. Dr. Luu examined Baskin in the PHF unit and determined that he suffered from depressive disorder, but he did not make a finding of PTSD because he only saw Baskin twice. On cross-examination, Dr. Luu acknowledged that doctors in the PHF units do not perform malingering tests, that it was possible for persons to malinger PTSD, and that they might have many motivations for doing so. On redirect, Dr. Luu agreed that malingering was not a diagnosis, but instead an additional condition that may be a focus of clinical attention.

16

Forensic toxicologist Dr. Alan Barbour testified that drug and alcohol tests done on Baskin between 3:00 and 4:00 p.m. on July 16, 2009, revealed no alcohol by that point, but did show benzodiazepines. Dr. Barbour noted that such drugs would include Valium, which tends to uninhibit a person and make the individual susceptible to suggestion. According to Dr. Barbour, a combination of alcohol, benzodiazepines, and extremely caffeinated drinks could make a person's "higher reasoning" considerably worse.

On cross-examination, Dr. Barbour acknowledged that he had no idea how much of the drug was in Baskin's body, as no quantitative testing was done. Nor did he know how much caffeine was in Baskin's system at the time.

Fellow inmate Quentin Hall noticed that Baskin got easily startled by loud noises. Hall surmised that Baskin had gone through war and experienced "gunshots and life and death and stuff."

In a July 27, 2009, telephone call to his mother, when asked why he had tried to kill himself, Baskin said "That's why I went to Fresno. I didn't go to Fresno to hurt Rachel." Baskin told his mother he "just wigged-out," did not remember what happened, had an "episode," and "blacked the fuck out."

*Defendant's Testimony*

Baskin testified that he grew up with parents who never married and had drug problems, that violence was rampant in the neighborhoods where he grew up, and that he was sexually assaulted by one of his mother's boyfriends and beaten by another. He was diagnosed with schizophrenia as a teenager and was bipolar, for which he underwent treatment. His mother suffered from manic depression and his father was bipolar.

Baskin joined the Army after 11th grade, concealing his mental illness so he would be accepted. He joined the Marine Corps in 2001, where he was taught to make quick decisions and to "hit first and … hit fast," regardless of whether it was the wrong

17

decision.  While in Iraq in 2007, the convoy he was in (although not the truck he was in) was hit by an improvised explosive device (IED).  No one was injured, but the event scared him.  After that, he experienced increasingly more painful headaches.  Baskin acknowledged never being in any direct combat while in the Marines in Afghanistan, Okinawa, or Iraq, although he had seen casualties, including a badly bleeding child he had held for a while.  Baskin received training while in the Marines on how to kill with a KA-BAR knife, which involved thrusting the knife through the neck of the victim and twisting it back and forth to slice the trachea.

According to Baskin, he was the most depressed and suicidal he had ever been the week before the July 16, 2009, events.  The night before he took two or three Valium and shared a bottle of Crown Royal with a friend.  Since he knew Rachel would not let him see Leilah, he thought he would "take" her by "surprise."  He had previously purchased the gun with three rounds so that he could shoot himself in the temple.  That night, he retrieved the gun and the kitchen knife and assembled his attack gear.  On the way to Reedley, he bought a pint of Crown Royal, which he mixed with Dr. Pepper, and he drank three Monster drinks and a Starbucks Frappuccino.

Rachel caught Baskin by surprise when she came out of the house.  Although he aimed the gun at her chest, she grabbed it and cut herself on the knife he was holding in the process.  Baskin told Rachel to go into the house, that he was not there to hurt her, but only to hurt himself and wanted to see his daughter before he died.

Once in the house, Baskin ordered the victims to sit down and told them he wanted to kill himself and write out a will to leave a gift for Leilah.  When he grabbed a pillow to muffle the shot, Rachel tried to give him a hug, but he told her to leave him alone.  While he anxiously paced, the gun went off accidentally, grazing Rachel in the process.  While he was apologizing to Rachel, Christopher attacked him and he reacted.  After Christopher was shot, he dropped the gun and did not remember what happened next.  He

18

did not remember hurting or even touching Linda.  Seeing all the blood took him back to his first tour of duty in Afghanistan.  Baskin told the officers after the incident that he was supposed to die, not "them."

On cross-examination, Baskin acknowledged that, on his health assessment after returning from Iraq in 2007, he stated he had not seen anyone wounded, killed or dead during the deployment.  He also denied being in any direct combat or ever feeling like his life was in danger.  He denied feeling depressed or suicidal or having nightmares.  He had not been diagnosed with PTSD before July 16, 2009.

In an interview on July 17, 2009, Purdy confirmed that Baskin had been "somewhat depressed" for two weeks.

*Rebuttal*

On July 17, 2009, licensed clinical social worker Jeffra Gay assessed Baskin to determine whether he met the criteria for a 5150 hold and determined he did not.  Gay saw no physical evidence that Baskin had attempted to kill himself.  Baskin told Gay he attempted an overdose in the week prior to coming to Reedley, but it did not work.  He explained, "I do not want to go that route anymore.  I just want to go to the jail and stand for this.  There is nothing the hospital can do for me."  Baskin also told Gay he wanted to go back to jail so he could use the telephone.   While Baskin had an "adjustment disorder with mixed disturbance of emotions and conduct," Gay was unable to support the diagnosis of PTSD or acute distress disorder.

Marine Corporal Manual Valle refuted Baskin's claim of how he was trained to use the KA-BAR knife.

When Detective Diedrich interviewed Baskin on July 16, 2009, he did not appear to be under the influence of alcohol.

19

**DISCUSSION**

I. DID THE TRIAL COURT ERR WHEN IT REFUSED TO INFORM THE JURY THAT OPINION TESTIMONY BY DETECTIVE DIEDRICH HAD BEEN STRICKEN?

Baskin contends that the trial court erred when it refused to inform the jury that it had stricken opinion testimony provided by Detective Diedrich. We find no prejudicial error.

*Procedural Background*

Reedley Police interrogated Baskin shortly after arresting him. The prosecutor played a recording of that conversation for the jury during trial. After the recording was played, Detective Diedrich, who conducted the interrogation, testified. Near the end of direct examination, Diedrich, in response to questions from the prosecutor, opined that he did not believe Baskin drove from San Diego to Reedley to commit suicide, but came instead with the intent to "[k]ill his family." Relevance objections by defense counsel were overruled.

The following day, defense counsel filed a written motion to strike Diedrich's lay opinion on an "ultimate issue of fact." The motion argued that a police officer's testimony regarding the truth of a criminal allegation did not qualify as either character evidence or an expert opinion, and that it usurped the jury's function as fact finder. The motion asked that the trial court strike Diedrich's testimony and "admonish the prosecutor not to do it again or refer to it in any way."

A week later, the trial court granted the motion, stating it would strike the testimony set forth in exhibit T, lines 12-17, a partial transcript that was submitted to support the motion. The trial court struck two statements by Diedrich in which the officer opined that Baskin drove to Reedley to kill his family. The trial court did not strike Diedrich's testimony that he disbelieved Baskin's assertion that he intended to kill himself. The trial court then asked defense counsel, "Does that satisfy your motion ....?

20

Defense counsel stated that it did and asked whether the jury would be "so noticed." The trial court responded:

> "No, I don't intent to do so. I've stricken it, that precludes [the prosecutor] from arguing that portion which I'm striking. Had you made a motion to strike at that time you made your objection, it would have been timely for the Court to advise the jury. The extent of the Court's order is to preclude [the prosecutor] from arguing that belief and that testimony by the officer. [¶] Had you made the motion to strike in addition to your objection of quote relevance, then I think that would have been timely and the Court would have appropriately noticed the jury. But now to go back and revisit that, and I just think it's appropriate to have the record reflect that the motion to strike is granted and, of course, [the prosecutor] is precluded from arguing to the jury which the Court has just stricken, namely that opinion or belief of the officer. [¶] And also to harken back to the[] conclusion of your motion, [trial counsel], I note that the conclusion of your motion reads as follows: 'The Court should now strike the testimony by the Prosecution's lead investigating officer upon the ultimate issue of the case and admonish the Prosecutor not to do it again or refer to it in any way.' So I've, to that extent, also complied with the conclusion of your motion."

*Applicable Law and Analysis*

The trial court has broad discretion to control the admission of evidence. (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) As such, the trial court retains ""''"a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice."''" (*People v. Lawley* (2002) 27 Cal.4th 102, 155.) On appeal, a trial court's decision to admit or exclude evidence is reviewed solely for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.)

21

Baskin now argues that, while the trial court correctly struck Diedrich's testimony, it committed reversible error when it refused defense counsel's request to inform the jury that this testimony had been stricken. We disagree.

Had the trial court informed the jury that it had struck the earlier testimony, it would have called even more attention to Diedrich's statement, which would likely have been more, not less, prejudicial to Baskin. Such a result is illustrated in *People v. Hardy* (1948) 33 Cal.2d 52, a capital murder case based almost entirely on out-of-court oral contradictory statements made by the defendant. (*Id.* at p. 55.) The trial court admitted testimony describing a confession by either the defendant or her coperpetrator husband - it was impossible to tell which one. The jury heard two versions of the witness's story. The witness testified directly to the jury, but the trial court then directed the reporter to read another version of the story, which the witness had given earlier outside the jury's presence. The next day, the trial court ordered the testimony stricken, but in the course of doing so, it again read the testimony to the jury. (*Id.* at pp. 60-61.) The Supreme Court noted that, "[u]nder ordinary circumstances," the trial court can correct an error in admitting evidence by ordering the evidence stricken and admonishing the jury to disregard it. (*Id.* at p. 61.) But under the circumstances of *Hardy*, the testimony "went to the main issue" and "was unduly emphasized by the manner in which it was presented" to the jury so that it was "extremely unlikely that the jury could wholly reject the evidence and completely disregard it in their deliberations." (*Id.* at p. 62.)

In any event, even assuming the trial court erred, we conclude there is no reasonable probability the jury would have reached a more favorable verdict for Baskin had the trial court advised the jury that the objectionable portion of Diedrich's testimony had been stricken. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [standard for determining whether an error constitutes a "'miscarriage of justice'" is whether "it is reasonably probable that a result more favorable to the appealing party would have been

22

reached in the absence of the error"]; *People v. Marks* (2003) 31 Cal.4th 197, 226-227 [holding with respect to error in admitting evidence that application of the ordinary rules of evidence "does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson*"].)  By the time Diedrich testified on this point, the jury had already heard each eye witness and victim, Rachel, Linda, and Christopher, testify to Baskin's action when he came to their home that morning, all of which evidenced that he did so for the purpose of killing them. Christopher testified specifically that he did not believe, based on Baskin's words and actions, that Baskin ever intended to kill himself.  Diedrich's two statements that Baskin drove to Reedley with the intent to kill the victims were mild and brief compared to the other portions of trial, and overshadowed by the large amount of evidence that Baskin did drive to Reedley to do just that.  We see no prejudice.

## II. DID THE TRIAL COURT VIOLATE BASKIN'S FEDERAL DUE PROCESS RIGHTS BY FAILING TO INSTRUCT THE JURY THAT EVIDENCE OF HIS UNCHARGED BAD ACTS AND PRIOR CRIMINAL CONDUCT COULD NOT BE USED TO SHOW HE WAS A PERSON OF BAD CHARACTER PREDISPOSED TO COMMIT CRIME?

Baskin contends that the trial court violated his federal due process rights by failing to instruct the jury, sua sponte, that evidence of his uncharged bad acts and prior criminal conduct could not be used to show he was a person of bad character who is predisposed to crime.  We find no error.

Baskin cites evidence of multiple bad acts, many of which were not criminal, but all of which reflected on his credibility.  These include: Baskin lying about why he arrived a week late to visit Rachel for Christmas in 2004 and then asking Rachel to lie about his whereabouts; being arrested for driving under the influence; providing Rachel with little financial assistance while they lived separately during their marriage; contacting other women on the Internet while married to Rachel; drinking heavily and

23

being emotionally abusive to Rachel; receiving supplemental pay for off-base housing while living in the barracks; having an affair with Purdy; and refusing to pay court-ordered support after Rachel filed for divorce. Baskin acknowledges that much of this evidence was admitted without objection by defense counsel.

As Baskin concedes, the trial court is generally not obligated to instruct sua sponte on the limited admissibility of evidence of past criminal conduct and bad acts. (*People v. Milner* (1988) 45 Cal.3d 227, 251-252; *People v. Collie* (1981) 30 Cal.3d 43, 63 (*Collie*); see also *People v. Carter* (2003) 30 Cal.4th 1166, 1198.) However, observing that the Supreme Court in *Collie* recognized a sua sponte limiting instruction may be required in "an occasional extraordinary case" if defense counsel's silence jeopardizes a fair trial, Baskin argues this is such a case. (*Collie*, *supra,* at p. 64.)

Baskin's reliance on the narrow exception recognized in *Collie* is misplaced. The *Collie* court emphasized the truly exceptional circumstances that must be present before such a sua sponte obligation would arise:

> "Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony *sua sponte* to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony. There may be an occasional extraordinary case in which unprotected evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case the *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence. But we hold that in this case, and in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." (*Collie, supra,* 30 Cal.3d at p. 64.)

In stark contrast to the hypothetical situation discussed in *Collie*, this case does not present the type of "extraordinary" situation contemplated by *Collie.* None of the evidence to which Baskin now cites constituted the "dominant part" of the proof against

24

Baskin.  (*Collie, supra,* 30 Cal.3d at p. 64.)  While the evidence was relevant as it provided a backdrop to the events of July 16, 2009, the key evidence which pointed toward Baskin's guilt was the testimony of the three victims who survived his vicious attacks and were able to describe Baskin's acts in detail.  At the same time, in light of the victims' testimony, none of the bad acts listed by Baskin could be considered "inflammatory" in comparison, and therefore there was little danger the jury would consider such evidence for improper purposes.  (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1094.)

Because there is no merit to Baskin's instructional claims of state law error, it follows that the claimed error did not violate his state and federal constitutional rights to due process, and we reject his claim to the contrary.

## III.  DID THE PROSECUTOR COMMIT PREJUDICIAL MISCONDUCT DURING JURY SUMMATION?

Baskin contends that the prosecutor committed misconduct in two instances during jury summation and thus violated his right to due process and a fair trial.  We disagree.

*Instances of Alleged Prosecutorial Misconduct*

Baskin points to the following two instances in which he claims prosecutorial misconduct occurred.

In the first instance, in closing, defense counsel had argued that Baskin had nothing to gain by malingering; that the jury "shouldn't even suspect malingering" because "[y]ou can't be diagnosed as a malingerer," citing Dr. Luu's testimony; that Baskin did not fit the criteria for malingering; and that the prosecutor had not presented any expert testimony from a psychiatrist to back up her claim that Baskin was malingering.  In response, during rebuttal, the prosecutor argued:

25

"[Defense counsel] actually asked the question: What did Dejon Baskin have to gain by malingering? Really? Here I go again with my five-year-old response? Really? It is mind boggling. What did he have to gain? He had to gain three counts of attempted murder. That's what he had to gain. Malingering is lying. [Defense counsel] is lying to you when he tells you there is no test for malingering, because Dr. Luu--"

At this point, defense counsel objected on grounds of prosecutorial misconduct and moved to strike. The trial court denied the motion. Baskin subsequently filed a motion for new trial in which he reasserted the incident as prosecutorial misconduct.

In the second instance, which also took place during rebuttal argument, the prosecutor asserted that Baskin had presented theories of voluntary intoxication, PTSD, blackout and unconsciousness, all in an effort to show he lacked specific intent to kill. The prosecutor then argued: "If you find Dejon Baskin not guilty, he goes home." Defense counsel objected as follows:

"[DEFENSE COUNSEL]: Objection, improper argument.

"THE COURT: Well, my concluding instruction will address that issue.

"[THE PROSECUTOR]: Goes home. As [defense counsel] said, this is not an insanity case. There was actually a juror question during the questioning period --

"[DEFENSE COUNSEL]: And prosecutorial misconduct, I'll make the objection.

"[THE PROSECUTOR]: The [d]efense is that there is no specific intent. If there's no specific intent, there's no attempted murder. If there's no attempted murder, there's an acquittal and he goes home.

"[DEFENSE COUNSEL]: Objection, same as before.

"[THE COURT]: Well, again, just so the record's clear, I will address in my concluding instruction that the jury is not to consider penalty or punishment."

The objection was then denied.

*Applicable Law and Analysis*

> "'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

Prosecutorial misconduct requires reversal only if it prejudices the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates only state law is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the objectionable conduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

"'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may "use appropriate epithets warranted by the evidence."' [Citations.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567-568.)

It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense or to imply that counsel is free to deceive the jury. (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) "When a prosecutor denigrates defense counsel, it directs the jury's

27

attention away from the evidence and is therefore improper.  [Citation.]  In addressing a claim of prosecutorial misconduct that is based on the denigration of opposing counsel, we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter.  [Citation.]"  (*People v. Frye* (1998) 18 Cal.4th 894, 978, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"[T]he prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.…  In doing so, the prosecutor may highlight the discrepancies between counsel's opening statement and the evidence.  [Citation.] Misconduct claims also have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced [citation], and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support [citation]."  (*People v. Bemore, supra,* 22 Cal.4th at pp. 846- 847.)  "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper.  [Citation.]"  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47.)

Here, as to the instance of "lying" to which Baskin objects, the prosecutor's argument was in direct response to defense counsel's argument that Baskin was not guilty of malingering because Baskin had nothing to gain by doing so, that according to Dr. Luu malingering was not a psychiatric diagnosis, and that the prosecutor failed to present any expert testimony from a psychiatrist to back up her claim that Baskin was malingering. At the time of defense counsel's objection, the prosecutor was attempting to explain her point by referring to Dr. Luu's testimony.  When allowed to continue, the prosecutor explained that Dr. Luu did not test Baskin for malingering because Dr. Luu's job, at the time he saw Baskin in the PHF unit, was to make sure he would not harm himself or

28

potentially harm anyone else. The prosecutor's intention was likely not to denigrate defense counsel personally, but to merely respond to counsel's closing argument that malingering was a myth. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1155 ["It was clear the prosecutor's comment was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally"], overruled on another point in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

Although we do not condone the prosecutor's comments to the jury -- "[i]f you find Dejon Baskin not guilty, he goes home" and "[i]f there's no attempted murder, there's an acquittal and he goes home" – we do not find that they rise to the level of prosecutorial misconduct. While a jury must consider only the law given by the trial court and the evidence admitted at the trial, the jury is governed by the presumption of innocence (see *People v. Aranda* (2012) 55 Cal.4th 342, 353) and the jury was fully instructed on these principles.

Baskin's reliance on *People v. Sorenson* (1964) 231 Cal.App.2d 88, 91, is misplaced. In that case, the prosecutor committed misconduct when he improperly suggested that the defendant, if acquitted, would be released from a mental hospital without a judicial hearing and a finding of restored sanity.

Here, the comments by the prosecutor amounted to nothing more than an appeal to the jury to return a guilty verdict. The essence of this argument was that the evidence supported the charges and the prosecutor wanted the jury to convict Baskin of each charge. This is precisely what prosecutors argue in every case and is not misconduct. (See *People v. Thomas* (2012) 54 Cal.4th 908, 946 [prosecutor's statements that defendant should be held accountable for his actions were not improper]; *People v. Wash* (1993) 6 Cal.4th 215, 261-262 [no misconduct where prosecutor urged the jury to "'make a statement,'" to "'do the right thing,'" and to restore confidence in the criminal justice system and return a death verdict].)

29

Even if the foregoing comments amounted to misconduct, Baskin fails to demonstrate that they were individually or cumulatively prejudicial under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [harmless beyond a reasonable doubt] or *Watson, supra,* 46 Cal.2d at page 836 [reasonable probability that the error did not affect the outcome]. The jury was fully instructed that they must consider only the law given by the trial court and the evidence admitted at trial, and that the remarks of counsel during closing argument were not evidence. The trial court also instructed the jurors that they must reach their verdict without any consideration of punishment. We presume jurors followed the trial court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) In addition, there was overwhelming evidence of Baskin's intent to kill, and any asserted error in the prosecutor's argument was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24; see also *People v. Booker* (2011) 51 Cal.4th 141, 186 [prosecutorial misconduct did not cause prejudice under *Chapman* or *Watson* when among other things evidence of defendant's guilt was overwhelming].)

## IV. DID THE TRIAL COURT COMMIT ERROR WHEN IT FAILED TO INSTRUCT SUA SPONTE THAT ASSAULT WITH A DEADLY WEAPON IS A LESSER INCLUDED OFFENSE OF ATTEMPTED MURDER?

Baskin contends that the trial court erred when it failed to instruct the jury, sua sponte, regarding assault with a deadly weapon as a lesser included offense of attempted murder. Relying on the gun use enhancement accompanying the attempted murder counts in counts one and two and the knife use enhancement accompanying the murder counts in counts one and three, Baskin argues that assault with a deadly weapon must be regarded as included within the charged allegations of attempted murder. For reasons explained below, we reject this contention.

Generally, the trial court is obligated to instruct sua sponte on lesser included offenses that the evidence tends to prove, even if the parties object to the instruction on

30

tactical grounds.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.)  "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.  [Citations.]"  (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

Under the "statutory elements" test, assault with a deadly weapon is not a lesser included offense of attempted murder, because an attempted murder can be committed without using a deadly weapon.  (*People v. Richmond* (1991) 2 Cal.App.4th 610, 616.) With respect to the "accusatory pleading" test, "enhancements may not be considered as part of an accusatory pleading for purposes of identifying lesser included offenses." (*People v. Sloan* (2007) 42 Cal.4th 110, 114, citing *People v. Wolcott* (1983) 34 Cal.3d 92, 101-102 (*Wolcott*).)  Thus, the deadly weapon enhancement allegations may not be considered in determining whether assault with a deadly weapon is a lesser included offense of attempted murder.  (See *People v. Richmond, supra,* at p. 616.)  The trial court's failure to give such an instruction here is not error.

Baskin acknowledges the holding in *Wolcott,* but contends it is no longer good law, arguing that enhancement allegations are now elements of an offense under *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny.  He further contends that the California Supreme Court's decision in *People v. Seel* (2004) 34 Cal.4th 535 supports his argument.  (See *id.* at p. 550 ["*Apprendi* now compels the conclusion that the premeditation allegation … constitutes an element of an offense"].)  But Baskin's contentions have been rejected by the California Supreme Court.  (See *People v. Izaguirre* (2007) 42 Cal.4th 126, 132-134 [rejecting contention that *Apprendi* and *Seel* require that conduct enhancements be treated the same as the legal elements of the crime in defining necessarily included offenses under the multiple conviction rule]; *People v.*

31

*Sloan, supra,* 42 Cal.4th at pp. 122-123 [same].) *Wolcott* is therefore still good law. (*People v. Alarcon* (2012) 210 Cal.App.4th 432, 436.)

Moreover, any instructional error was harmless, as it was not reasonably probable that the error affected the verdict. (*People v. Rogers* (2006) 39 Cal.4th 826, 867 [erroneous failure to instruct on lesser included offense in noncapital case is subject to harmless error standard set forth in *Watson, supra,* 46 Cal.2d at p. 836].) The prosecution's case against Baskin was strong. Baskin drove overnight from San Diego to the victims' home in Reedley, arriving early in the morning. Armed with a knife and gun and dressed in dark clothing, including a mask over his face, he surprised and attacked Rachel. From there the attacks continued, including shooting Rachel and Christopher and slicing Rachel and Linda's necks. The circumstances of the attack evidenced an intent to kill. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561 [circumstances of attack, including fact that defendant stabbed vital areas, showed "defendant could have had no other intent than to kill"].) On this record, it was not reasonably probable that the jury would have returned a more favorable verdict had it been instructed on the offense of assault with a deadly weapon. (*People v. Breverman, supra,* 19 Cal.4th at p. 178.)

V. WAS THE EVIDENCE INSUFFICIENT UNDER FEDERAL DUE PROCESS STANDARDS TO SUPPORT A FINDING THAT RACHEL SUFFERED GREAT BODILY INJURY AS A PROXIMATE RESULT OF A GUNSHOT WOUND?

Baskin contends there is insufficient evidence to uphold the true finding on an allegation attached to count one that Baskin personally discharged a firearm proximately causing Rachel to suffer great bodily injury, within the meaning of section 12022.53, subdivision (d). We disagree.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence - that is, evidence that is reasonable,

32

credible, and of solid value - from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'This standard applies whether direct or circumstantial evidence is involved.'" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) These standards also apply to our review of sentencing enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Section 12022.53, subdivision (d) provides that 25 years is added to a sentence if the defendant inflicted great bodily injury by personally and intentionally discharging a firearm. "'[G]reat bodily injury'" is defined as "a significant or substantial physical injury" (§ 12022.7, subd. (f)), which requires "substantial injury beyond that inherent in the offense," but not "'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*People v. Escobar* (1992) 3 Cal.4th 740, 746, 750.) This is an issue of fact and we must accept the jury's finding even if the circumstances might reasonably be reconciled with a contrary finding. (*Id.* at p. 750.) "'"A fine line can divide an injury from being significant or substantial from an injury that does not meet the description.'" [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 63.)

Baskin argues that Rachel's grazing gunshot wound above her left ear did not constitute great bodily injury, citing the fact that the number of stitches was unspecified, the burning sensation it caused was very short lived, and the ringing in her ear lasted only about two days.

33

We find sufficient evidence supported the jury's finding that Rachel suffered great bodily injury. Rachel testified that Baskin shot her from approximately two feet away and the bullet hit her on the side of her head near her ear. She testified the side of her head was burning as if it were "on fire." The wounds caused continuous bleeding during the remainder of Baskin's attack on the victims. The nearness of the shot caused Rachel's ears to ring, which lasted for two days. The wound required multiple stitches in a rainbow-shaped pattern, which hurt particularly when the stitches "popped out." At the time of trial, three years after the incident, Rachel described the scar as still itching and at times still hurting, as if the nerves were "reattaching." Courts have found great bodily injury under similar facts. (See *Wolcott, supra,* 34 Cal.3d at p. 107 [great bodily injury from bullet wound that left fragments in victim, but caused little blood loss or pain, did not require sutures, and caused no permanent disability; victim was released after treatment and went to work the next day]; *People v. Mendias* (1993) 17 Cal.App.4th 195, 201, 206 [great bodily injury from bullet wound requiring hospital treatment, even though victim was discharged the next day; bullet was not removed but caused no pain]; *People v. Lopez* (1986) 176 Cal.App.3d 460, 463-465 & fn. 5 [great bodily injury from gunshot wound to one victim near buttock and gunshot wound to another victim through thigh, even absent evidence victims sought or received medical treatment].)

VI. CUMULATIVE ERROR

Baskin contends finally that the cumulative impact of all of the above errors deprived him of a fair trial. We have either rejected Baskin's claims of error and/or found that any errors, assumed or not, were not prejudicial. Viewed cumulatively, we find that any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

34

**DISPOSITION**

The judgment is affirmed.

_____
Franson, J.

WE CONCUR:

_____
Levy, Acting P.J.

_____
Gomes, J.